UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

LANE MCDONOUGH,

                Plaintiff,

      v.

THE NEW YORK CITY DEPARTMENT OF
EDUCATION, PAUL DIDIO

                Defendants.

-------------------------------------------------------------x

16-cv-4272 (LTS)(JLC)

**PLAINTIFF'S FIRST
AMENDED COMPLAINT
AND JURY DEMAND**

Plaintiff, LANE MCDONOUGH, upon personal knowledge as to himself and upon information and belief as to other matters, alleges as follows:

## NATURE OF THE CLAIM

1.    This case is about a public school principal's discrimination and retaliation against a teacher based on gender and gender stereotypes at one of the largest public school district in this country. The New York City Department of Education ("the DOE") is charged with educating over one million students, making it one of the largest school districts in the United States.

2.    Specifically, plaintiff files this lawsuit in response to the campaign of harassment that he suffered while employed at P.S. 159 at the hands of his principal, defendant Paul DiDio ("defendant DiDio"), on the basis of plaintiff's gender, and the fact that plaintiff's "effeminate" qualities. Although plaintiff complained of this discrimination to his union representative and defendant DiDio's superior, his complaints were ignored and he was instead met with more hostility and terminated in retaliation for making his complaints.

3.    Defendants' discrimination and retaliation violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the New York State Human Rights Law,

1

New York Executive Law §§ 296 *et seq.* ("NYSHRL") and the New York City Human Rights Law, New York City Administrative Code §§ 8-107 *et seq.* ("NYCHRL").

4. Accordingly, this lawsuit seeks declaratory relief and compensatory and punitive damages in order to redress the past deprivation of rights secured to plaintiff under Title VII, NYSHRL and NYCHRL, and to compensate plaintiff for the emotional distress that he has suffered because of the discrimination and retaliation.

## JURISDICTION AND VENUE

5. This Court has original subject matter jurisdiction over plaintiff's Title VII claims pursuant to 28 U.S.C. §§ 1331 and 1343, respectively, because they arise under the laws of the United States and are brought to recover damages for deprivation of equal rights.

6. This Court has supplemental jurisdiction over plaintiff's NYSHRL and NYCHRL claims pursuant to 28 U.S.C. § 1367 because they arise from a common nucleus of operative facts with the federal claims and are so related to the federal claims as to form part of the same case or controversy under Article III of the United States Constitution.

7. Venue is proper in this judicial district under 29 U.S.C. § 1391(c) and 42 U.S.C. § 2000e-5(f)(3) because defendants conduct business in and can be deemed to reside in this district and employment records relevant to the unlawful employment practice are maintained and administered here.

8. Plaintiff filed a timely charge of gender and sexual orientation discrimination and retaliation under Title VII with the Equal Employment Opportunity Commission (EEOC") on September 24, 2015, and received a Notice of Right to Sue dated March 11, 2016 attached hereto as Exhibit 1 and incorporated by reference.

9. All other conditions precedent to the filing of this suit have been satisfied.

## PARTIES

**Plaintiff**

10.     Plaintiff LANE MCDONOUGH ("plaintiff") is a man who was employed by the DOE between May, 2012 and July, 2015. Between May, 2012 and on or about June 26, 2014, plaintiff was employed by the DOE as a substitute teacher; and between on or about June 27, 2014 and July 1, 2015, plaintiff was employed by the DOE as a full-time elementary teacher.

11.     Plaintiff's dream has always been to be a teacher, and he has spent the past eight (8) years of his life taking the correct steps and obtaining the appropriate education to further that dream. Plaintiff holds a B.A., an M.A. in Elementary Education and TESL Certification from The City University of New York, Queens College.

12.     Other than the incidents described herein, during his tenure as a DOE employee, plaintiff has consistently garnered praise from both supervisors (including defendant DiDio), and parents for his excellent pedagogical abilities and rapport with students.

13.     Between on or about June 27, 2014 and July 1, 2015, plaintiff's supervisor was defendant DiDio.

**Defendants**

14.     The DOE is a person within the meaning of 42 U.S.C. § 2000e(a), and an employer within the meaning of 42 U.S.C. § 2000e(b).

15.     The DOE oversees approximately 1,800 schools and 1.1 million students, making it one of the largest school districts in the United States.

16.     Upon information and belief, the DOE maintains control, oversight, and direction over the operation of its schools, including its employment practices.

17.     The DOE has nearly 135,000 full-time employees.

3

18.     P.S. 159 is a DOE school located in District 26 at 205-01 33 Avenue, Queens, NY 11361, and serves approximately 650 students.

19.     The DOE is responsible for establishing the terms, conditions, and other practices that bear upon the employment of all DOE teachers, including the teachers at P.S. 159.

20.     During all relevant times, the DOE was plaintiff's employer within the meaning of the applicable statutes.

21.     Defendant PAUL DIDIO ("defendant DiDio") was the Principal of P.S. 159 between the 2011-2012 and 2014-2015 school years, and a employee of the DOE.

22.     During the 2014-2015 school year, Danielle Giunta was the District 26 Community Superintendent ("Superintendent Giunta"), and defendant DiDio's direct supervisor. Superintendent Giunta was appointed by the DOE to oversee the operations of District 26, including the management of all District 26 employees.

### FACTUAL ALLEGATIONS

### Defendant DiDio's Pursuit of Plaintiff for Employment Based On Gender Stereotypes and Perceived Sexual Orientation

23.     By way of background, plaintiff has what his friends and family characterize as "effeminate qualities" and, accordingly, plaintiff is frequently asked by others if he is homosexual.

24.     In November, 2013, defendant DiDio observed plaintiff's teaching on several occasions, and provided him with very positive feedback.

25.     In January, 2014, defendant DiDio told plaintiff that he wanted to hire him to teach at P.S. 159, but that there were no available positions at the school. Defendant DiDio therefore offered to write plaintiff a positive recommendation for a position that was open at another school, which plaintiff accepted.

4

26.     In March 2014, defendant DiDio wrote plaintiff a second positive recommendation letter praising plaintiff's pedagogical abilities.

27.     On June 2, 2014, defendant DiDio interviewed plaintiff for a position at P.S. 159. During the interview, defendant DiDio informed plaintiff, "I am hesitant to hire men because I had a bad experience once. I gave a male teacher a bad review, and he retaliated by accusing me of soliciting a blow job." Defendant DiDio then stated, "I would like to put you in the second grade, but I don't think men should teach below the second grade." Although plaintiff was shocked and made to feel very uncomfortable by defendant DiDio's remarks, he made every effort not to demonstrate a reaction, and instead froze with a small smile on his face.

28.     Directly after this interaction, defendant DiDio appeared to be satisfied with plaintiff's response, and therefore offered plaintiff a teaching position, which plaintiff accepted.

29.     For the 2014-2015 school year, plaintiff was the only male teacher hired out of a cohort of six (6) new teachers—all of whom were probationary (untenured).

30.     During the 2014-2015 school year, P.S. 159 employed approximately thirty-five (35) teachers, six (6) of whom were probationary. The remaining twenty-nine (29) teachers were tenured.

31.     During the 2014-2015 school year, only two (2) of P.S. 159's thirty-five (35) teachers were male. Further, only one of those male teachers, plaintiff, was untenured. The other male teacher, Chris Mosera, was tenured. In addition, upon information and belief, Chris Mosera is widely considered to be very "effeminate."

32.     On information and belief, defendant DiDio pursued and hired plaintiff because of plaintiff's effeminate qualities and the assumption that plaintiff was homosexual by: (1) praising plaintiff's pedagogical abilities, (2) offering to write (and actually writing) two glowing letters of

5

recommendation for plaintiff, (3) inviting plaintiff to interview at P.S. 159, and (4) offering plaintiff a teaching position at his school.

**Defendant DiDio Stopped Perceiving Plaintiff as Homosexual**

33.    On August 1, 2014, defendant DiDio requested a meeting with plaintiff, and when plaintiff arrived to the meeting, defendant DiDio stated "I told you my story, why didn't you tell me yours?" Defendant DiDio proceeded to tell plaintiff that he had requested the meeting in order to follow DOE protocol requiring principals to confer with all new hires regarding any potential negative marks in their files, and that the DOE computer system indicated that plaintiff had received an adverse rating from another principal named Mr. Wright who had previously employed plaintiff as a substitute teacher. Plaintiff explained that he had sent a casual email from his personal email account to a teacher-friend's personal email account, but that Mr. Wright had somehow read the email correspondence and found it to be unprofessional. But because the email correspondence involved the personal email correspondence between plaintiff and his friend, defendant DiDio advised plaintiff that it was "not a big deal" and that his job offer at P.S. 159 would not be affected.

34.    On August 11, 2014, defendant DiDio requested another meeting with plaintiff, and asked plaintiff to bring a copy of the email correspondence that they had discussed during the previous meeting. During the meeting, Defendant DiDio informed plaintiff that he had spoken with Mr. Wright who had informed defendant DiDio that the other teacher involved in the email correspondence was a woman who Mr. Wright believed to be of "romantic interest" to plaintiff. Defendant DiDio asked plaintiff if he and the woman teacher were ever romantically involved or if plaintiff had ever asked her out. Plaintiff advised defendant DiDio that he had not been romantically involved with the woman teacher and provided him a copy of the email

6

correspondence. The correspondence was familiar and friendly, and clearly implied a flirtatious dynamic between plaintiff and the woman teacher.

35.    Upon information and belief, on August 11, 2014, after speaking with Mr. Wright and after reading the email correspondence between plaintiff and the woman teacher, defendant DiDio no longer believed that plaintiff was homosexual.

## Adverse Employment Actions Taken Against Plaintiff at the Direction of Defendant DiDio and on the Basis of Plaintiff's Gender

36.    After discovering that plaintiff was not homosexual, defendant DiDio commenced a year-long campaign of harassment against plaintiff based on plaintiff's gender. This campaign of harassment included unfairly and negatively evaluating plaintiff's performance, harassing plaintiff through the use of third parties, publicly embarrassing and ridiculing plaintiff in front of his colleagues based on plaintiff's effeminate qualities, and eventually, terminating plaintiff in retaliation for plaintiff's complaints of discrimination.

### Negative Evaluations of Plaintiff's Lessons

37.    Under DOE policy, if a probationary (untenured) teacher receives a negative rating for a school year, that teacher may be terminated from his or her employment with the DOE.

38.    During the 2014-2015 school year, defendant DiDio and A.P. Catalano (at the direction of defendant DiDio), reviewed several of plaintiff's lessons and rated him negatively. These ratings were unfair and in violation of DOE policy, and based on plaintiff's gender. On information and belief, similarly situated women teachers were not subject to the same evaluation standards.

39.    Plaintiff was hired to teach the fifth grade at P.S. 159 for the 2014-2015 school year, and accordingly, he spent the summer preparing to teach the fifth grade, including writing a

fifth grade curriculum, planning fifth grade lessons, designing lesson activities appropriate for fifth graders and buying materials for fifth grade learners.

40. On or about September 15, 2014, plaintiff had a conference with defendant DiDio and A.P. Catalano to discuss the manner in his performance would be evaluated for the year, and was asked to sign a form. When plaintiff signed the form, defendant DiDio laughed and nudged A.P. Catalano, and exclaimed, "Look at his signature!" making plaintiff feel embarrassed and ridiculed.

41. At the beginning of October, 2014, defendant DiDio abruptly transferred plaintiff from teaching fifth grade to second grade. Plaintiff was not given time to prepare for the new curriculum, and was given three days to move all of his books and materials into a new classroom during which time he was also required to teach his initially assigned fifth grade class, train the new fifth grade teacher, and job shadow his direct supervisor Grace Ballas.

42. Christina Rodriguez, another second grade teacher, advised plaintiff that defendant DiDio asked all of the other second grade teachers to select students that they did not want from their own classes, and used these students to create plaintiff's new second grade class. Ms. Rodriguez advised plaintiff that all of the second grade teachers had selected students that they considered to be "problematic" with behavioral problems.

43. On October 28, 2014, notwithstanding the short amount of time that had lapsed since plaintiff was abruptly transferred from teaching the fifth grade to teaching the second grade and his inability to adequately prepare for his new teaching assignment, defendant DiDio conducted the first observation of plaintiff's second grade reading class. During the observation, defendant DiDio reprimanded plaintiff for boxes that were in his classroom that belonged to the teacher who formerly used that room, although this is not a basis by which teachers are permitted

to be negatively evaluated under DOE policy. Also, when plaintiff demonstrated his ability to get the students to be quiet and pay attention by employing a tactic used by many of the other teachers (involving raising one hand in the air, followed by the students also raising their hands—a technique that is considered to be highly efficient by the DOE's own standards), defendant DiDio told plaintiff that it was a form of "corporal punishment." Defendant DiDio rated plaintiff negatively for this classroom observation.

44.    On November 24, 2014, defendant DiDio conducted another observation of plaintiff's second grade reading class. However, defendant DiDio arrived and left at the beginning of the class and was only present in the classroom for a very short period of time. After the observation, defendant DiDio called plaintiff into his office. Plaintiff entered the office and asked defendant DiDio for lesson feedback, and in response, defendant DiDio looked at Lane and laughed, and said, "Lane, come into my bathroom and fix your collar. It's been driving me crazy since I walked into your room." Plaintiff felt uncomfortable and therefore, in order to avoid going with defendant DiDio into his personal bathroom, he immediately fixed his collar while standing in front of defendant DiDio.

45.    Defendant DiDio did not hold a post-observation conference for the November 24, 2014 observation, in violation of DOE policy, but on December 17, 2014, defendant DiDio provided plaintiff with an observation report from the observation that included a negative rating and a description of events that did not occur. Plaintiff confronted defendant DiDio about the fabricated report and reminded him that he was only present for a short period of time and did not actually observe any of the components for which he had evaluated plaintiff. Defendant DiDio acknowledged that plaintiff was correct and agreed to change the report. Nevertheless, defendant DiDio still rated plaintiff negatively for this observation.

46.    On February 9, 2015, A.P. Catalano conducted another observation of plaintiff's second grade writing class, during which time a student with known behavioral problems acted out. The next day, on or about February 10, 2015, plaintiff informed defendant DiDio of the student's behavior, and in response, defendant DiDio slapped his hand through the air and stated, "[Student] needs a slap to the back of the head." No post-observation conference was held for plaintiff for the fourth observation, in violation of DOE policy. Nevertheless, plaintiff was rated plaintiff negatively for this observation.

47.    On March 23, 2015, defendant DiDio conducted another observation of plaintiff's second grade writing class. Although the observation report was not provided to plaintiff until over two (2) months after the observation and in violation of DOE policy, plaintiff nonethtless received a negative rating for this observation.

48.    On March 24, 2015, plaintiff attended a post-observation meeting for the March 24, 2015 observation with defendant DiDio and A.P. Catalano. At the meeting, and in front of A.P. Catalano, defendant DiDio stated, "I don't think men should teach below second grade. If I were a parent and dropped off my pre-k child, and the teacher was a guy, I would feel weird about it." Defendant DiDio then added, "that's why I'm not sure where to place you next year Lane. I'm considering assigning you as an Art teacher."

49.    On April 27, 2015, defendant DiDio conducted a Principal Practice Observation ("PPO") of plaintiff's second grade reading class, and afterward, informed plaintiff that the observation went very well, and that they would meet at a later time to discuss the observation. However, this meeting never occurred.

50.    On May 11, 2015, defendant DiDio advised all of the women teachers at P.S. 159 that he would permit them to use their PPOs as their sixth annual informal observation.

However, defendant DiDio informed plaintiff that he was not permitted to use his PPO as his sixth observation, and refused to discuss the PPO conducted for plaintiff.

51. On May 18, 2015, A.P. Catalano conducted another observation of plaintiff's second grade reading class. No post-observation conference was held for this observation, in violation of DOE policy, but plaintiff nonetheless received a negative rating for this observation.

52. On information and belief, during the relevant period, it was an unwritten school policy at P.S. 159 for defendant DiDio and A.P. Catalano to conduct two observations for reading, two observations for writing, and two observations for math. However, on or about May 11, 2015 (approximately one week before plaintiff's final observation), A.P. Catalano stated to plaintiff, "you indicated that math is your strong point so [defendant DiDio] wants to see improvement in writing." The decision not to conduct plaintiff's last observation for math contradicted the school's policy to distribute observations evenly among math, reading and writing—a policy that, upon information and belief, applied to the evaluations of all women teachers at P.S. 159.

### Defendant DiDio's Use of Third-Party "Mentors" to Harrass Plaintiff

53. Prior to the beginning of the 2014-2015 school year, plaintiff was advised that DOE policy required that throughout their first year of teaching, all first-year teachers are to receive one-to-one mentoring from experienced teachers who are to provide them with a minimum of two periods of collegial support each week. Plaintiff was given information that stated, "Your mentor supports you in the context of a collegial, nonjudgmental relationship where discussions are confidential and not reported back to your principal."

54. On the first day of school, September 4, 2014, defendant DiDio assigned Allie Myers as plaintiff's mentor. However, this assignment was a violation of DOE policy because Ms. Myers was not an experienced teacher, but rather, the school's literacy coach.

55. Instead of providing plaintiff with two periods of mentoring per week, as required under DOE policy, defendant DiDio only required Ms. Myers to provide sporadic and inconsistent mentoring to plaintiff. Oftentimes, Ms. Myers would show up to plaintiff's class once every couple of weeks and say, "Lane, I'm sorry I haven't been around," and only stay to observe for five minutes. Therefore, on or about October 15, 2014, plaintiff reminded Ms. Myers of her obligation to provide him with the requisite two periods of mentoring each week, as provided under the collective bargaining agreement. In response, Ms. Myers waved her hand and said, "Don't worry about it, it's all computerized."

56. In January 2015, defendant DiDio began sending Fran Boemio, a staff support member from the DOE's teacher support network, to plaintiff's class on a regular basis, and informed plaintiff that Ms. Boemio was a mentor whose role was not to evaluate plaintiff, but only to offer him pedagogical support. Ms. Boemio observed plaintiff on a handful of occasions. Because Ms. Boemio was supposed to be there for formative and non-evaluative purposes, plaintiff opened up to her about his classes and shared his first-year teaching challenges with her, hoping to receive some pointers and advice. While in plaintiff's classroom, Ms. Boemio was usually preoccupied and using her cell phone, and at no point did plaintiff observe Ms. Boemio take notes of her observations or meetings with plaintiff.

57. On or about February 5, 2015, defendant DiDio called plaintiff into his office and stated, "Fran [Boemio] told me you told her that you don't teach after lunch." Plaintiff responded, "That's not true, I never told her that." Defendant DiDio then looked down at a

12

notebook on his desk, and stated, "Actually, she said you told her you have trouble controlling your class after lunch." Plaintiff stated, "I told her that because I thought she was there to support me and that she'd give me classroom management advice." Defendant DiDio slowly shook his head and said, "This stuff gets back to me, Lane." Plaintiff began to feel extreme stress and anxiety, because it was clear that defendant DiDio had directed Ms. Boemio to gain plaintiff's trust on the pretext that she was a mentor and non-evaluator, thereby inducing plaintiff to trust and confide in her, while the true purpose was to report information about plaintiff to defendant DiDio. On information and belief, Ms. Boemio did not observe or act as mentor to any other similarly situated women teachers.

<u>Defendant DiDio's Attempts to Humiliate Plaintiff on the Basis of Gender Stereotypes</u>

58.     On February 14, 2015—Valentine's Day—the staff of P.S. 159 was asked to contribute to a staff potluck breakfast. Plaintiff arrived to the breakfast with homemade brownies, and advised his colleagues that he had baked them himself. In response, defendant DiDio exclaimed in a mocking tone, "Hey, everyone! Lane baked brownies! Guess I'm going to have to start a Home Ec. Class for him now!" Plaintiff felt embarrassed and ridiculed by defendant DiDio's announcement, which generated laughter and sneers from his colleagues.

59.     On March 18, 2015, while plaintiff was engaged in a friendly conversation with Rachel Marquez, a woman school aide, both plaintiff and Ms. Marquez noticed defendant DiDio standing nearby and eavesdropping on their conversation. After plaintiff and Ms. Marquez finished speaking, defendant DiDio called Ms. Marquez into his office, where A.P. Catalano was also waiting, and stated, "If any of my teachers ever bother you, you can come to me." A.P. Catalano smiled and asked defendant DiDio to which teacher he was referring, and defendant

DiDio responded, "There are three males employed at this school, one is married and I'm gay."
After being advised of defendant DiDio's comments, plaintiff felt embarrassed and humiliated.

60.     On or about April 3, 2015, a bouquet of flowers was delivered to the main office
of P.S. 159 for Ms. Marquez from her boyfriend, and defendant DiDio signed for the flowers'
delivery. When Ms. Marquez arrived to the main office, and in the presence of several staff and
faculty members, defendant DiDio pretended to read the card that accompanied Ms. Marquez'
bouquet of flowers and loudly exclaimed, "To Rachel, from Lane!" After being advised of the
scene defendant DiDio made with the bouquet of flowers, plaintiff felt embarrassed and
humiliated.

61.     On April 22, 2015, Administrative Assistant Day, plaintiff brought cookies and a
thank you card for the administrative staff at P.S. 159. That day, defendant DiDio called plaintiff
on his classroom telephone and said, "The one good thing I can say about you is that you're
generous."

62.     On May 19, 2015, during a school-wide event, defendant DiDio observed a
mobile project that had been created by several of plaintiff's students. When the wire of the
mobile became tangled, defendant DiDio shouted in front of the entire staff and faculty, "Why
don't you take it home for your mommy to fix, Lane?" several people laughed, subjecting
plaintiff to humiliation and ridicule.

63.     In addition, defendant DiDio's harassment of plaintiff in front of the staff and
faculty created a hostile work environment, where staff members felt free to join in the
harassment of plaintiff based on gender stereotypes. One example occurred on or about May 1,
2015, when a woman teacher shouted in front of the staff and faculty, "Hey Lane, why don't you
give [defendant] DiDio a lap dance as a gift for his tenure? He would love that!"

## Defendant DiDio's Treatment of Other Male Teachers Is Evidence That His Bias Against Plaintiff is Based on His Gender

64.     Upon information and belief, Mr. Mosera, the only other male teacher at P.S. 159, is considered to have effeminate qualities similar to plaintiff's.

65.     On December 22, 2014, Mr. Mosera, the only other male teacher at P.S. 159, advised plaintiff that he had also worked for defendant DiDio at P.S. 127, where defendant DiDio was formerly the assistant principal. Mr. Mosera told plaintiff that defendant DiDio would always pass him in the hall and say, "Are you gay? Are you sure you're not gay?" On information and belief, defendant DiDio only hired Mr. Mosera for his teaching position at P.S. 159 because of his effeminate qualities and the assumption that he was homosexual.

66.     However, as Mr. Mosera is tenured, his teaching position is highly protected. Therefore, unlike in plaintiff's case, defendant DiDio was unable to harass Mr. Mosera when he discovered that he was not homosexual.

## Defendant DiDio's Different Treatment of Untenured Women Teachers Is Further Evidence of His Bias Against Plaintiff Based on His Gender

67.     Upon information and belief, none of the untenured women teachers at P.S. 159 during the 2014-2015 school year were subject to the same harassment as plaintiff, including the manner in which defendant DiDio (and A.P. Catalano at his direction) evaluated plaintiff in violation of DOE policy; the public ridicule and humiliation of plaintiff; the use of mentors to harass plaintiff; and the eventual retaliation and termination of plaintiff.

68.     In March, 2015, Erin Gallagher, another P.S. 159 first-year untenured teacher, informed plaintiff that she had received a written disciplinary letter in her personnel file as a result of a complaint from a student's parent. Gallagher was not disciplined or terminated.

69.     Upon information and belief, all five female teachers from plaintiff's probationary class were reappointed at P.S. 159 for the 2015-2016 academic year.

**Defendant DiDio Retaliated Against Plaintiff for Complaining About Discrimination**

70.     On or about April 15, 2015, and on several occasions thereafter, plaintiff complained to Janice Testagrosse, his union representative, of the ongoing discriminatory harassment that he was experiencing at the hands of defendant DiDio. Ms. Testagrosse encouraged plaintiff to confide in her, and frequently responded with supporting comments such as, "I hate that man [defendant DiDio]." Although plaintiff had intended for his complaints against defendant DiDio to remain confidential, Ms. Testagrosse informed defendant DiDio of plaintiff's complaints.

71.     Accordingly, on or about May 1, 2015, plaintiff was asked directly by defendant DiDio whether plaintiff believed that defendant DiDio had been treating him unfairly. Plaintiff stated, "Yes, you have been picking on me all year." Plaintiff proceeded to describe several instances of defendant DiDio's harassment over the past school year.

Unfair and Pretextual Discipline

72.     On information and belief, at P.S. 159, because teachers are required to have their students prepared for a prompt dismissal at the end of each day, all teachers are permitted the flexibility of showing movies, playing games or planning independent reading time during the last period of the day in order to allow them the ability to multitask with the end of day duties.

73.     On May 19, 2015, during the last period of the day, A.P. Catalano entered plaintiff's second grade classroom unannounced and asked plaintiff what he had taught that period. Plaintiff advised her that he had allotted the second half of the class to independent

reading in order to allow him the time to work with a few students on their writing pieces while simultaneously preparing the children for dismissal.

74. On information and belief, the administration of P.S. 159 did not conduct such "pop-in" visits in classes taught by similarly situated women teachers.

75. On May 20, 2015, Defendant DiDio informed plaintiff "this is the last straw" because plaintiff was "not prepared to teach" the day before, and therefore plaintiff would be terminated at the end of the school year.

76. DOE Policy prohibits the use of "counseling memos" to discipline teachers.

77. However, on May 29, 2015, plaintiff received a counseling memo for A.P. Catalano's May 19, 2015 pop-in visit of plaintiff's class, which noted, "it is your professional responsibility to be prepared for work each day." The counseling memo also stated, "a counseling memo is not disciplinary in any manner and cannot be used in any action against an employee except to prove notice if the employee denies the notice."

Retaliatory Termination

78. On June 1, 2015, Defendant DiDio handed plaintiff a letter from Superintendent Giunta advising plaintiff that she would be reviewing the matter of plaintiff's discontinuance on July 1, 2015. The letter further advised that Superintendent Giunta would be considering the "reasons included in the attached documentation and such documents constitute a written statement of the reasons for my consideration of your discontinuance." Included with the letter were the ratings of plaintiff's classroom observations and the recent counseling memo. Plaintiff was given until June 24, 2015 to submit a written response.

79. In handing over the June 1, 2015 letter from Superintendent Giunta, defendant DiDio informed plaintiff that Superintendent Giunta would also be considering notes that he had

provided her by plaintiff's mentors Ms. Myers and Ms. Boemio. Plaintiff was unaware of the existence of any notes taken by Ms. Myers and Ms. Boemio, but, according to DOE policy, both were only to have observed plaintiff's teaching for formative and non-evaluative purposes, and their feedback was supposed to remain confidential.

80.     On June 4, 2015, during a meeting for the entire staff, defendant DiDio handed out the list of teachers who would be reemployed at the school the following year. Defendant DiDio then proceeded to read each name aloud. Although a final determination of plaintiff's job status had not yet been made by Superintendent Giunta, plaintiff was the only person whose name did not appear on the list, and his name was the only name not read aloud, subjecting him to public shame and ridicule.

81.     Immediately following the June 4, 2015 meeting, one of plaintiff's coworkers advised him that defendant DiDio had never read the names of the previous year's staff out loud before. After the meeting, Grace Ballas, plaintiff's direct supervisor and grade leader, advised plaintiff that she was never consulted about defendant DiDio's plan to recommend plaintiff's termination to Superintendent Giunta, and informed plaintiff that she had only good things to report about his performance as a teacher.

82.     On June 12, 2015, Caresa Osborn, a parent of one of plaintiff's students, advised plaintiff that she had sent a letter of commendation to defendant DiDio and Superintendent Giunta on plaintiff's behalf. But as plaintiff had not been notified that a letter of commendation from a parent had been submitted to his file on his behalf, on June 12, 2015, plaintiff sent an email to defendant DiDio to inquire about the letter of commendation from Ms. Osborn.

83.     On June 13, 2015, plaintiff sent a written response to Superintendent Giunta's letter notifying him that he may be terminated, and advised her of, *inter alia*, examples of the

harassment plaintiff had experienced at the hands of defendant DiDio. As a result of plaintiff's letter, Superintendent Giunta initiated a complaint with the DOE's OEO against defendant DiDio.

84.     On June 15, 2015, defendant DiDio announced all of the names of the following year's staff over the school's loudspeaker and requested that they come to his office to receive their annual performance ratings. Plaintiff's name was not called and defendant DiDio did not provide him with his annual performance rating.

85.     On June 16, 2015, defendant DiDio advised plaintiff that he should consider resigning, and added that if plaintiff is asked why he resigned in a future interview, he should say it was "due to his mother's illness." Plaintiff informed defendant DiDio that he would not resign, that he would never lie about his mother's health, and that he would never lie to future potential employers. During this conversation, defendant DiDio gave plaintiff Ms. Osborn's letter of commendation. After the conversation, plaintiff sent a follow-up email to defendant DiDio to memorialize the conversation and to request, *inter alia*, all copies of letters of commendation that had been received by defendant DiDio on his behalf, and plaintiff's annual performance rating, which had been distributed to the rest of the teachers the day before.

86.     On June 17, 2015, at a meeting in the presence of A.P. Catalano and Ms. Testagrosse (the union representative) to address plaintiff's June 16, 2015 email, defendant DiDio commenced the meeting by stating, "Lane, your use of caps in the letter made me feel threatened." Defendant DiDio then informed plaintiff that he would not be provided with his annual performance rating until the last day of school. Plaintiff reminded Defendant DiDio that every other teacher at P.S. 159 had already received annual performance rating, and that he wanted to provide his rating to Superintendent Giunta before she made a final determination

regarding his termination. Plaintiff also requested his students' test scores, which he knew to be very good, in order to be able to provide them to Superintendent Giunta. In response, defendant DiDio stated, "Lane, when you are discontinued on July first, you will never be able to work in District 26 again. And you should know the difference between being discontinued and me going after your state license." Plaintiff noticed that a copy of the email correspondence between himself and the woman teacher that was the subject of his adverse substitute rating a few years earlier was on the table, and defendant DiDio picked it up and said, "Lane, I have in my hand an email you sent that describes your classroom management problems. Is there anything you would like to add, or would you like me to send this to [Superintendent] Giunta?"

87.     On June 22, 2015, defendant DiDio finally provided plaintiff with his annual performance rating, which was based solely on the subjective observations that were unfairly conducted in violation of the DOE policy. However, at no point did defendant DiDio provide plaintiff with a copy of his students' test scores.

88.     On or about July 3, 2015, plaintiff received a letter from Superintendent Giunta dated July 1, 2015, advising plaintiff that he was terminated effective July 1, 2015.

89.     On September 8, 2015, plaintiff received his overall performance evaluation for the 2014-2015 school year, which consisted of his annual performance rating from defendant DiDio and a rating for his students' performance ratings. Plaintiff scored in the highest level of the Effective category, which is considered to be a sign of very proficient pedagogy.

**FIRST CLAIM FOR RELIEF**
**(Discrimination Against Plaintiff in Violation of Title VII)**

90.     Plaintiff repeats, reiterates, and incorporates each and every preceding paragraph as if set forth fully herein.

91.     Defendants violated Title VII by discriminating against plaintiff on the basis of his gender.

## SECOND CLAIM FOR RELIEF
### (Discrimination Against Plaintiff in Violation of NYSHRL)

92.     Plaintiff repeats, reiterates, and incorporates each and every preceding paragraph as if set forth fully herein.

93.     Defendants violated NYSHRL by discriminating against plaintiff on the basis of his gender and sexual orientation.

## THIRD CLAIM FOR RELIEF
### (Discrimination Against Plaintiff in Violation of NYCHRL)

94.     Plaintiff repeats, reiterates, and incorporates each and every preceding paragraph as if set forth fully herein.

95.     Defendants violated NYCHRL by discriminating against plaintiff on the basis of gender, gender identity, gender expression and sexual orientation.

## FOURTH CLAIM FOR RELIEF
### (Retaliation Against Plaintiff in Violation of Title VII)

96.     Plaintiff repeats, reiterates, and incorporates each and every preceding paragraph as if set forth fully herein.

97.     Defendants violated Title VII by retaliating against plaintiff for engaging in actions protected by Title VII.

## FIFTH CLAIM FOR RELIEF
### (Retaliation Against Plaintiff in Violation of NYSHRL)

98.     Plaintiff repeats, reiterates, and incorporates each and every preceding paragraph as if set forth fully herein.

99. Defendants violated N.Y. Exec. Law § 296(e) by retaliating against plaintiff for engaging in actions protected by the NYSHRL.

## SIXTH CLAIM FOR RELIEF
### (Retaliation Against Plaintiff in Violation of NYCHRL)

100. Plaintiff repeats, reiterates, and incorporates each and every preceding paragraph as if set forth fully herein.

101. Defendants violated NYCHRL by retaliating against plaintiff for engaging in actions protected by the NYCHRL.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff requests relief as follows:

**A.** A declaration that defendants discriminated and retaliated against plaintiff in violation of Title VII;

**B.** A declaration that defendants discriminated and retaliated against plaintiff in violation of NYSHRL;

**C.** A declaration that defendants discriminated and retaliated against plaintiff in violation of NYCHRL;

**D.** An order of reinstatement, or, in lieu of reinstatement, an award of front pay damages for defendants' violations of Title VII, NYSHRL and NYCHRL;

**E.** An award of economic damages, including back pay and all fringe benefits for defendants' violations of Title VII, NYSHRL and NYCHRL;

**F.** An award of compensatory damages for emotional distress and suffering for defendants' violations of Title VII, NYSHRL and NYCHRL;

**G.** An award of punitive damages for defendants' violations of Title VII, NYSHRL and NYCHRL;

**H.**     An award of civil penalties for defendants' violations of NYSHRL and NYCHRL;

**I.**     An award of attorney's fees and costs;

**J.**     Such relief as is authorized by federal, state and municipal law;

**K.**     Such other relief as the Court deems just and proper;

## JURY TRIAL

Plaintiff demands a jury trial for all causes of action and claims for which he has a right to a jury trial.

Dated: New York, New York
      January 6, 2017

                     Respectfully submitted,

                     MIRER MAZZOCCHI SCHALET JULIEN &
                     CHICKEDANTZ, PLLC

                     By:_____
                         Maria L. Chickedantz
                     150 Broadway, Suite 1200
                     New York, NY 10038
                     Tel. (212) 231-2235
                     Fax (212) 409-8338
                     *Attorneys for Plaintiff*
                     maria@mmsjlaw.com

**Exhibit A**

EEOC Form 161 (11-09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To: Lane McDonough
29-50 167th Street
Flushing, NY 11358

From: New York District Office
33 Whitehall Street
5th Floor
New York, NY 10004

[ ] On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 520-2015-03738 | Roxanne Zygmund, Investigator | (212) 336-3764 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[ ] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[X] Other *(briefly state)* **Charging Party is in State Court**

### - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.

On behalf of the Commission

*Kevin J. Berry,*
District Director

MAR 0 8 2016

*(Date Mailed)*

Enclosures(s)

cc: Rachael Teitel, Esq.
NYC Department of Education
Office of Legal Services
52 Chambers St., Rm 308
New York, NY 10007

Maria L. Chickedantz, Esq.
Eisner & Associates, P.C.
113 University Place, Eighth Floor
New York, NY 10003-4527