SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------------x
In the Matter of the Application of

LANE McDONOUGH,

                       Petitioner,                      Index No.: 101966/2015

For an Order and Judgment Pursuant to Article 78 of the
Civil Practice Law and Rules

      --against--

THE DEPARTMENT OF EDUCATION OF THE CITY
SCHOOL DISTRICT OF THE CITY OF NEW YORK,

                       Respondent.
-----------------------------------------------------------------------x


# REPLY MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S AMENDED VERIFIED ARTICLE 78 PETITION


MIRER MAZZOCCHI SCHALET, JULIEN & CHICKEDANTZ, PLLC

*Attorneys for Petitioner*

150 Broadway, Suite 1200
New York, New York 10038
(212) 231-2235

By: Maria L. Chickedantz

## PRELIMINARY STATEMENT

In this Article 78 petition, Lane McDonough, a probationary teacher, seeks to annul the determination of respondent New York City Department of Education ("DOE") terminating his employment because of the undisputed fact that the decision to terminate petitioner was based solely on six (6) classroom observation reports conducted in violation of New York Education Law, the Collective Bargaining Agreement between the UFT and DOE ("the Contract") and the DOE's rules concerning the pedagogical evaluation of teachers.

As discussed in further detail in his Amended Verified Petition, petitioner was employed as an elementary teacher in Queens at P.S. 159, presided over by Principal Paul DiDio. On June 1, 2015, based on Principal DiDio's bad faith recommendation to the District 26 community superintendent Danielle Giunta ("the Superintendent") that petitioner should be discontinued, petitioner received a notice advising him that the Superintendent would be reviewing the matter of his discontinuance, and "the attached documents constitute a written statement of the reasons for my consideration of your discontinuance." (Am. V. Pet., Ex. N [the June 1, 2015 Superintendent's Discontinuance Notice]). Attached to the Superintendent's Discontinuance Notice were six (6) classroom observation reports conducted by the administration of P.S. 159 for petitioner during the 2014-2015 school year and one Counseling Memo, all which had been provided to her by Principal DiDio. (Am. V. Pet. 52).

Although petitioner responded to the Discontinuance Notice in a letter containing examples of Principal DiDio's harassment over the school year and documentation demonstrating that petitioner's students' academic scores had sharply improved based on his

1

pedagogy, on July 1, 2015, the Superintendent terminated petitioner from his position with the DOE. (Am. V. Pet. 63; Ex. T [the July 1, 2015 Termination Letter]; Ex. P [Petitioner's Response to Discontinuance Notice]).

In respondent's Verified Answer, with regard to the documents considered by the Superintendent in reaching the decision to terminate petitioner, respondent only disputes whether the Superintendent considered the Counseling Memo, and provides a sworn affidavit from Principal DiDio in which he swears, "[t]o the best of my knowledge, the Counseling Memo dated May 29, 2015 was not included in the Superintendent package dated June 1, 2015." (Aff. of Paul J. DiDio in Supp. of Resp't V. Ans., ¶ 25). Respondent does not contend that the Superintendent considered anything other than the six (6) observation reports (attached to the Amended Verified Petition as Exhibits F through K) and petitioner's response (attached thereto as Exhibit P), but instead argues that the six observation reports "documented [petitioner's] continued unsatisfactory performance," and contain "legitimate reasons" for petitioner's termination. (Resp't Mem. of Law in Sup. of Resp't V. Ans., p. 4).

Thus, the sole issue before this Court is whether the six (6) observation reports and petitioner's response to the Superintendent's Discontinuance Notice formed a sufficient basis for the Superintendent's decision to terminate petitioner. As discussed in great detail in petitioner's Memorandum of Law in Support of the Amended Verified Petition, each of the six (6) observation reports consisted entirely of component ratings that were made in violation of the pedagogical review procedures of Education Law § 3012-c and the APPR procedures contained in the Contract and the DOE's official procedures for evaluating the pedagogical performance of teachers.

## ARGUMENT

**I.  PETITIONER HAS ESTABLISED A DEFICIENCY IN HIS PEDAGOGICAL REVIEW PROCESS THAT WAS NOT MERELY TECHNICAL, BUT UNDERMINED THE INTEGRITY AND FAIRNESS OF THE PROCESS**

A probationary teacher may not be terminated in bad faith, for constitutionally impermissible reasons, or in violation of law. *Brown v. City of New York*, 280 A.D.2d 368, 370 (2001); *Matter of Frasier v. Board of Educ. of City School Dist. of City of N.Y.*, 71 N.Y.2d 763, 765 (1988). In order to demonstrate that the decision to terminate a probationary teacher's employment was made in bad faith, the teacher must establish "a deficiency in the review process to terminate petitioner's employment that was 'not merely technical, but undermined the integrity and fairness of the process.'" *Mendez v. New York City Dept. of Educ.*, 132 A.D.3d 533, 535 (1st Dep't 2015)(granting probationary teacher's Article 78 petition and annulling her termination by weighing her satisfactory end-of-year ratings against respondent's feebly-supported negative evaluation). A deficiency in the review process meets the bad faith standard where the DOE "did not adhere to their procedures or those provided in the parties' collective bargaining agreement." *Matter of Murray v. Board of Educ. of the City School Dist. of the City of N.Y.*, 131 A.D.3d 861, 865 (1st Dep't 2015). See also *Matter of St. Vil v Board of Educ. of the City Sch. Dist. of the City of N.Y.*, 133 A.D.3d 438 (1st Dep't 2015)(granting probationary teacher's Article 78 petition and annulling his termination because "the record demonstrates deficiencies in the performance review process" where probationary teacher's negative rating was "based primarily on the principal's alleged personal observations as a rating officer" and the teacher was not on notice that "he

3

was at risk of an unsatisfactory rating" notwithstanding "assistance of guidance counselor and literary coach").

Here, as described in petitioner's Memorandum of Law in Support of the Amended Verified Petition, the six (6) observation reports were subjective evaluations of petitioner's teaching, and none of the negative component ratings in any of the six observation reports complied with the APPR requirements as mandated by New York Education Law § 3012-c, the Contract, or the DOE's rules on evaluating the pedagogy of teachers. (See Pet'r Mem. of Law in Sup. of Am. V. Pet., pp 5-26). In addition, petitioner received an overall year-end rating of Effective and submitted documentary evidence to the Superintendent of his students' outstanding progress that was the result of his pedagogy. (Am. V. Pet., Ex. U [petitioner's Year-End Rating for 2014-15], Ex. P [petitioner's Response to the Discontinuance Notice]). Because of the high strides made by his students over the 2014-2015 school year in their intellectual growth and development, petitioner was not on notice that he was at risk of termination at the end of the year based on his pedagogical performance—and he logically had no reason to be on notice that his pedagogy would be deemed inadequate given his Effective end-of-year rating. (Am. V. Pet., ¶ 65).

*Matter of Kolmel v. City of New York* is a case similar to the instant matter where a probationary teacher was terminated based on negative classroom observations. In granting the teacher's Article 78 petition and annulling her termination, the First Department acknowledged that the negative classroom observations relied upon by the DOE as a basis for the teacher's termination "could rationally support a finding that petitioner had not developed into a proficient high school social studies teacher." *Matter of Kolmel v. City of New York*, 88

4

A.D.3d 527, 528 (1st Dep't 2011). The Court nevertheless found that "deficiencies in the review process" leading to petitioner's termination were "not merely technical, but undermined the integrity and fairness of the process" because the evidence submitted by the probationary teacher demonstrated that she had been evaluated in "violation of the DOE's rules concerning teacher rankings" and that her pedagogical evaluation report "on its face, was completed by the principal in an arbitrary manner, including unsatisfactory rankings in every category, even where unsupported by any evidence or contradicted by evidence in the report itself." *Id.*, at 528-29.

Similarly, as discussed in great detail in petitioner's Memorandum of Law in Support of his Petition, each of the six observation reports on their face demonstrate that petitioner was evaluated in an arbitrary and capricious manner, as they consist entirely of observation notes for categories that evaluators are explicitly prohibited from using for evaluative purposes, in violation of the statutory, contractual and DOE standardized procedures for evaluating the pedagogy of teachers. New York Education Law mandates that the pedagogical performance of teachers be evaluated in accordance with the APPR procedures reached through collective bargaining, and that teacher performance evaluations consist of a combination of objective student academic scores and subjective classroom observation evaluations. Education Law §§ 3012-c(1) and (2)(a)(1); Education Law § 3012-d(13). The APPR procedures require that classroom observations be evaluated based on the components contained in the Danielson Rubric, as follows:

> In order to simplify and focus the use of the Danielson's Framework for Teaching (2013 Edition), and reduce unnecessary paperwork, **only the following eight (8) components of the rubric shall be rated: 1(a), 1(e), 2(a), 2(d), 3(b), 3(c), 3(d),**

5

**and 4(e).** These eight (8) components shall be referred to herein as the "Danielson Rubric." Any reference to Danielson or Danielson Rubric in the Commissioner's Decision shall be deemed to refer only to these eight (8) components. In each observation, all components of the Danielson Rubric shall be rated for which there is observed evidence. **The remaining components of the Danielson Framework for Teaching (2013 Edition) not described herein will continue to be used by the parties for formative purposes.**

Contract, p. 62.

For evaluative purposes, evaluators are only permitted to rate teachers on the eight above-listed components by assigning a HEDI quality rating to any of the eight components that are observed during the classroom observation, as detailed in the Danielson Rubric. (Contract, p. 62; See also the Danielson Rubric, attached as Ex. 3 to the Affirm. of Maria L. Chickedantz in Sup. of Am. V. Pet.). The eight (8) Danielson Rubric components that may be evaluated are: 1(a): Demonstrating knowledge of content and pedagogy; 1(e): Designing coherent instruction; 2(a): Creating an environment of respect and rapport; 2(d): Managing student behavior; 3(b): Using questions and discussion techniques; 3(c): Engaging students in learning; 3(d) Using assessment in instruction; and 4(e): Growing and developing professionally. (See, e.g., Danielson Rubric).

Here, the six observation reports consist of: 27 negative component ratings that were based on lawfully proscribed criteria (Pet'r Mem. of Law in Sup. of Am. V. Pet., pp 8-22); 10 negative component ratings that were based on examples of Effective teaching (id., pp. 22-24); 11 negative component ratings that were based on an absence of observed evidence (id., pp. 24-25); and 7 negative component ratings that were duplicates of other improperly

deemed negative component ratings (id., pp. 25-26). (See also the Demonstrative Chart, attached as Ex. 3 to the Affirm. of Maria L. Chickedantz in Sup. of Am. V. Pet.).

## II. RESPONDENT'S ARGUMENT IS SUPPORTED BY EVIDENCE THAT CORROBORATES THAT PETITIONER WAS EVALUATED IN VIOLATION OF STATUTORY, CONTRACTUAL AND DOE AUTHORITY

In Respondent's Verified Answer, respondent puts forth evidence that in fact corroborates petitioner's position that the six observation reports were conducted in violation of Education Law § 3012-c, the APPR procedures contained in the Contract, and the DOE's official procedures for evaluating the pedagogical performance of teachers. The component ratings described by respondent consist exclusively of evidence permitted for formative ratings of teachers, which are strictly prohibited from being used for evaluative purposes. (See Contract, p. 62).

Respondent notes that Principal DiDio's observation reports were based on the following anecdotal evidence:

- "Petitioner needed to 'establish rituals and routines' and that 'basic classroom rules and regulations need[ed] to be taught.'" (Resp't V. Answer, ¶ 118, Ex. 5). Although Principal DiDio contradicts himself in the next sentence by acknowledging the existence of a student behavioral chart posted on the wall with a color coded system in place (id.), the establishment of classroom rituals, rules and procedures are encompassed by Component 2(c) of the Danielson Rubric: Managing classroom procedures, which is a component that may not be rated for evaluative purposes in order to evaluate a teacher's pedagogy. (See Contract, p. 62; the Danielson Rubric, p. 31).

- "Petitioner needed to 'create a classroom environment that [was] early childhood friendly'" because "there [were] empty bulletin boards that can be filled by celebrating student work." (Resp't V. Answer, ¶ 119, Ex. 5). Yet organizing the classroom environment is encompassed by Component 2(e) of the Danielson Rubric: Organizing physical space, and a component that may not be rated for evaluative

7

purposes in order to evaluate a teacher's pedagogy. (See Contract, p. 62; and the Danielson Rubric, p. 37).

- Petitioner needs to "be more open to constructive criticism from [his] colleagues, grade partners, grade learners, mentor assistant principal, and [Principal DiDio]," and that "P.S. 159 is a 'collaborative professional community' where a teacher can grow only if they are 'open to... ideas" and "willing to put in the hard work required to be a successful teacher."" (Resp't V. Answer, ¶ 119, Ex. 5). Yet this evidence is encompassed by Component 4(d) of the Danielson Rubric: Participation in the professional community, and a component that may not be rated for evaluative purposes in order to evaluate a teacher's pedagogy. (See Contract, p. 62; and the Danielson Rubric, p. 69).

- As evidence of ineffective pedagogy under Component 3(c), petitioner's "lesson lacked 'differentiation'" and "the 'teaching point and the activity did not align.'" (Resp't V. Answer, ¶ 125, Ex. 6). However, in direct contradiction, Principal DiDio acknowledged that petitioner had indeed planned a differentiated lesson for ELL students, but the negative rating was because "I had left your room prior to seeing any students work on it." (id., Ex. 6). Nonetheless, a teacher's ability to plan general education lessons that also consider ELL students is encompassed by Component 1(b) of the Danielson Rubric: Demonstrating knowledge of students, which specifically covers a teacher's ability to teach "[s]tudents whose first language is not English, as well as students with other special needs," and a component that may not be rated for evaluative purposes in order to evaluate a teacher's pedagogy. (See Contract, p. 62; and the Danielson Rubric, p. 9-10).

- "The learning activity was not directly aligned to the learning objective" because "students were unable to make connections." (Resp't V. Answer, ¶ 125, Ex. 6). Yet, evidence of a teacher's skill in making students understand what they are learning and what they are expected to do during the lesson activity is encompassed by Component 3(a) of the Danielson Rubric: Communicating with students, and a component that may not be rated for evaluative purposes in order to evaluate a teacher's pedagogy. (See Contract, p. 62; and the Danielson Rubric, p. 41-43).

- "'There is little evidence that you are taking the advice of your support network and implementing these best practices into your classroom' despite receiving 'a lot of professional development from the Literacy Coach, Network Support Specialist and Administration Team." (Resp't V. Answer, ¶ 156, Ex. 11). Evidence of a teacher's efforts to grow as a teacher, including a teacher's attempts to enhance his content knowledge and pedagogical skill and/or his receptivity to feedback from colleagues is encompassed by Component 4(e) of the Danielson Rubric: Growing and developing, and an evaluator is only permitted to rate this category if *actually*

*witnessed* during the observation or within 15 days prior. (See Contract, p. 63; and the Danielson Rubric, p. 72).

Notably absent from Principal DiDio's observation notes is anecdotal evidence pertaining to any of the eight (8) Danielson Rubric components which are permitted for evaluative purposes. Instead, Principal DiDio improperly evaluated petitioner's pedagogy by rating him for observations encompassed by the components that are only permitted to be used for formative purposes and not evaluative purposes. (Contract, p. 62).

Similarly, respondent notes the anecdotal evidence used by A.P. Catalano in her observation reports of petitioner:

- The presence of "books, papers, pencils, and articles of clothing on the floor," and "students papers were scattered about [petitioner's] desk and the conference table." (Resp't V. Answer, ¶ 124, Ex. 7). As discussed above, evidence of the physical state of the classroom is encompassed by Component 2(e) of the Danielson Rubric: Organizing physical space, and a component that may not be rated for evaluative purposes in order to evaluate a teacher's pedagogy. (See the UFT Collective Bargaining Agreement, p. 62; and the Danielson Rubric, p. 37).

- "'[W]hen addressing the students, [petitioner should] not be dismissive when they ask or discuss something unrelated to the topic, but rather explain when a more appropriate time would be." (Resp't V. Answer, ¶ 124, Ex. 7). Evidence of a teacher's efforts to encourage students to respect their education and the learning process is encompassed by Component 2(b) of the Danielson Rubric: Establishing a culture for learning, which is a component that may not be rated for evaluative purposes in order to evaluate a teacher's pedagogy. (See the UFT Collective Bargaining Agreement, p. 62; and the Danielson Rubric, p. 29).

- Petitioner should "establish protocols for class discussions and routines for the students to follow throughout the day." (Resp't V. Answer, ¶ 124, Ex. 7). As discussed above, the establishment of classroom protocols and routines are encompassed by Component 2(c) of the Danielson Rubric: Managing classroom procedures, which is a component that may not be rated for evaluative purposes in order to evaluate a teacher's pedagogy. (See the UFT Collective Bargaining Agreement, p. 62; and the Danielson Rubric, p. 31).

- "'There was no evidence of ESL strategies or methodologies' used and that petitioner's performance was 'uneven.'" (Resp't V. Answer, ¶ 145, Ex. 10). As discussed above, a teacher's ability to plan lessons that consider the needs of non-English speaking students is encompassed by Component 1(b) of the Danielson Rubric: Demonstrating knowledge of students, which explicitly covers a teacher's ability to instruct "[s]tudents whose first language is not English" and a component that may not be rated for evaluative purposes in order to evaluate a teacher's pedagogy. (See the UFT Collective Bargaining Agreement, p. 62; and the Danielson Rubric, p. 9-10).

- "A.P. Catalano noted that while the lesson plan petitioner submitted was 'well organized and contained many components... vital to a successful lesson,' petitioner's 'lack of time management and differentiation in its delivery' hamstrung the lesson's potential effectiveness." (Resp't V. Answer, ¶ 164, Ex. 13).

Taking a cue from her supervisor Principal DiDio, absent from A.P. Catalano's observation notes is anecdotal evidence pertaining to any of the eight (8) Danielson Rubric components permitted for evaluative purposes. Instead, like Principal DiDio, A.P. Catalano improperly evaluated petitioner's pedagogy by rating him for observations encompassed by the components that are only permitted to be used for formative purposes and not evaluative purposes. (Contract, p. 62). Respondent further notes that "Assistant Principal Catalano wrote that petitioner's 'performance in various areas across the [Danielson] framework has been inconsistent' highlighting a 'lack of prioritizing tasks, [c]lassroom management, time management and organization' as the three areas petitioner needs to improve." (Resp't V. Answer, ¶ 164, Ex. 13). Yet these three areas are covered by components that may only be used for formative purposes: 2(c)(Managing classroom procedures); 2(e)(Organizing physical space) and 3(e) Demonstrating flexibility and responsiveness). (See, e.g., Danielson Rubric).

10

## RESPONDENT'S REMAINING POINTS ARE NOT
## RELEVANT TO THE INSTANT PETITION

In its Verified Answer, respondent includes information about two third-party non-evaluators (Ms. Myers and Ms. Boemio) in an attempt to bolster the DOE's argument that petitioner's pedagogy was inadequate. Notwithstanding the fact that this information is hearsay; that petitioner has never seen the notes allegedly created by these third-parties prior to respondent's answer in this matter; and that it is prohibited from being used in order to evaluate a teacher's pedagogy (Contract, p. 65), none of this third-party information is relevant to the instant matter because it was not considered by the Superintendent in her determination to terminate petitioner.

## RESPONDANT PROVIDES FURTHER EVIDENCE OF PRINCIPAL DIDIO'S BAD
## FAITH MOTIVE FOR RECOMMENDING TERMINATION

As an initial matter, petitioner does not bring discrimination claims in the instant Article 78 Petition, so respondent's argument that Principal DiDio's actions are not violations of New York City Human Rights Law is misplaced. Petitioner simply includes evidence of Principal DiDio's dislike of petitioner for reasons unrelated to his pedagogy in order to provide context and demonstrate motive. This does not change the fact that the sole issue before the Court pertains to the Superintendent's determination to terminate petitioner.

Nevertheless, respondent provides further evidence demonstrating how Principal DiDio's dislike of petitioner for reasons unrelated to his pedagogy motivated him to recommend petitioner for termination (Principal DiDio's bad faith motive is described in more detail in Petitioner's Amended Verified Petition). In support of its Verified Answer, respondent includes an Affidavit of Principal DiDio which includes the false sworn statement

11

that "a female teacher had filed a sexual harassment charge against Mr. McDonough." (Resp't V. Answer, ¶ 92; Aff. of Paul J. DiDio, ¶ 9). The issue to which Principal DiDio refers (which is discussed in further detail in Petitioner's Amended Verified Petition) is a since-reversed substitute U-rating that was given to petitioner at the end of the 2012-2013 school year because of an email petitioner sent to a colleague, and, according to the former principal it was "based on his language [in the email] and his feelings of substituting were very negative." (Transcript from U-rating Hearing, p. 9, attached to Petitioner's Reply Affidavit as Ex. B; Email attached to Pet'r Am. V. Pet. as Ex. D). This U-rating was appealed, reversed and deemed to be improper. (Letter Advising Petitioner that the Substitute U-Rating was reversed is attached to Petitioner's Reply Affidavit as Ex. A). Moreover, in the transcript from the U-rating hearing, the principal explicitly stated that the female teacher "did not pursue [a sexual harassment complaint]." (Transcript from U-rating Hearing, p. 34, attached to Petitioner's Reply Affidavit as Ex. B). In short, Principal DiDio simply had no basis for accusing petitioner of a past sexual harassment charge, and this baseless and defamatory allegation demonstrates a dislike for petitioner that runs far deeper than anything related to petitioner's pedagogy, further supporting petitioner's position that the Superintendent's decision to terminate him was based on a bad faith recommendation by Principal DiDio where he provided her with six (6) observation reports that were conducted in violation of the law, contract and DOE rules.

## CONCLUSION

For the foregoing reasons, we respectfully request that the determination to terminate petitioner should be annulled, and petitioner should be reinstated to a teaching position in his license area within his district and/or borough, with back pay, costs and attorney's fees.

Dated: New York, New York
      June 10, 2016

Respectfully submitted,

MIRER MAZZOCCHI SCHALET JULIEN & CHICKEDANTZ, PLLC

By: Maria Chickedantz
*Attorneys for Petitioner*
150 Broadway, 12th floor
New York, NY 10038
(212) 231-2235
maria@mmsjlaw.com

13

Index No. 101966/2015
SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

LANE McDONOUGH,

                              Petitioner,

For a Judgment Pursuant to Article 78 of the Civil Practice Law and Rules,

          -against-

THE DEPARTMENT OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY
OF NEW YORK,

                              Respondents.

---

## REPLY MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S AMENDED
## VERIFIED ARTICLE 78 PETITION

---

MIRER MAZZOCCHI SCHALET JULIEN & CHICKEDANTZ, PLLC
By: Maria L. Chickedantz
150 Broadway, 12th Floor
New York, NY 10038
T: 212-231-2235
F: 212-409-8338
maria@mmsjlaw.com